Thank you. Thanks. Good morning. Good morning, your honor. Attorney Colbill Strale, representing the appellant and the plaintiff Martha Bonilla, may you please stand to be referred to the court. Yes. Thank you. Our appeal of the district court report to recall opinions is based on three arguments. The first, that there were issues of disputed facts. That there were also issues of credibility that had to be assessed of the witness. And also that there were issues of inferences that should not be made for the employer. Instead, they should have been made for the non-moving party, which was the employee, apparently, Martha. The circuit court is being asked to determine if the plaintiff put forth sufficient evidence from which a jury could decide that the adverse action that was taken by the employer was more probably than not caused by discrimination. Determining which views are more accurate, I refer to the case Admet-Jensen, 2014. Determining which view is more accurate and reflects a reality requires fact-finding and credibility judgments are properly the task for a jury. And I'm referring to the case Straub-Delta-Eyewine. In this case, my client, Martha, put forth sufficient evidence in her opposition against the defendant's motion for summary judgment to create disputed facts that should have been submitted to a fact-finding jury. And I want to just give you two brief examples. My client was falsely charged with the fabricated accusation that she piggybacked. On the testimony, through answers to requests for admissions and testimony, the defendant's decision-maker testified he could not recall which document that refers to. There is not a policy of the employee which relates to that description of piggybacking. As a matter of fact, a payee's brief refers to it as a term commonly known. So there is no specific regulation for this. Now, in this case, there are differences in terms of what the defendant has said throughout the time. From the time the complaint was answered, from the time the motion, the supposed motion was filed, to the appeals. And I'll give you a brief example as to the discrepancies in the theories. If you go to a payee's page 9 brief, it says, while Ortiz provided, this is the harasser, the person Martha Lesch, the harasser, while Ortiz provided a specific date regarding plaintiffs abandoning her post for a few hours. Now, that's what the payee says in the payee's brief. When you go to the answer to the complaint, paragraph 26, it is affirmative to the order that Ortiz complained to an employee that on June 14, 2014, plaintiff used foul language towards him. That was the first answer that the defendants did to that allegation. That is docket number, sorry, docket number 11. Now, if you go to the written statement that the defendants received from Mr. Ortiz, which is in the Appellee Supplementary Appendix, page 2000, I'm sorry, 209 to 2013, and you read the statement that was provided by Martha, you're going to find different things. If you go to Mr. Ortiz's statement, I'm going to go into that in a second. Mr. Ortiz's statement was submitted June 18, 2014. This is the written statement that was given by the harasser to the employee. This is the statement that they used to fabricate accusations against Martha. Nowhere in Mr. Ortiz's statement, you're going to find the three charges that were levied against Martha, that she abandoned her post, she used her phone, and that she had a gauge in piggyback. Now, if you read Mr. Ortiz's statement, none of those allegations are in his statement. Now, the defendant fabricated these charges against my client because she had her post on off-white, she had written a statement on it. I thought there was a videotape of her piggybacking. Well, that video was obtained by ICE, but the piggybacking itself is, if you look at the definition of piggybacking through CEDAP training, which is the one that was referred by defendants, it provides for unauthorized access. What someone who has the authority do, when you look at the video, you see two securities. I'm just getting to, I'm trying to understand what difference it makes whether Ortiz alleged that or not. There's a videotape. Because this was a piece of... How is that fabricated? Because according to defendants, Ortiz was the person in charge who brought this information to the attention of the employer. This information is in the sense that if the harasser uses a meeting, which was a meeting that was to take place to discuss the situation between these two employees, that they weren't getting along, they work as a female and male detention guard at this post, and they're not getting along, and you take that meeting and you use that meeting and you don't focus on the allegations of the harasser, then you're not paying attention to the allegations... But the employer punished both Ortiz and your client for that meeting with a five-day reprimand That's not what's at issue here. What's at issue here is that ICE reviewed the situation and determined that three employees, not including Ortiz, but including your client, could no longer work at the airport. ICE had the right to do that. Your client knew that ICE had the right to do it. She had agreed to that as a condition of her employment. And there's no evidence at all that ICE acted in a discriminatory manner? There is, Your Honor, if you'll allow me. There is a number in there, which is drafted by the assistant point manager. That number in there, which is a number about the meeting you just referred to, was also sent to Mr. Elpidio Rubio, who was the ICE person who obtained that video. If he received that via email, he was aware that Mr. Ortiz had also engaged in violations. No. But ICE elected him. No allegation, no allegation in that memo or anywhere else that Ortiz engaged in any security violations. Every employee who ICE found to have engaged in security violations was ordered removed from that employment. There were three of them. Two women and a man. Your client being one of them. Ortiz was never found guilty of a security violation, nor have you offered any evidence that he committed a security violation. But there was a treatment that was disparate, Your Honor. There were three of your employees, including Mr. Ortiz, and Mr. Reverend Hernandez, and Jose Ortiz, I believe. All three were charged with the same violations that Martha was. When you look at the disciplinary numbers, which are part of the... Excuse me. What do you mean the same violations? Excuse me. They were charged with piggybacking? No. They were charged with leaving their post? They were charged with violation of policy number 10 and 112. Were they charged with either piggybacking or leaving their post? But that's not... That piggybacking was not a charge that was... Just answer my question. Were they charged with either of those two things? Not piggybacking, but at least one of those employees had an airport ID credential violation. He had an expired ID. Were any of those three men charged with piggybacking or leaving their post? That's a very simple question. It calls for a yes or no answer. No, Your Honor. Okay. Just so I understand what you're... You're saying these words, piggybacking, leaving post, aren't the charge. The charge is violation of X policy, right? That's what you're saying, Your Honor. So then the question is, why does that matter? Just hold on. For purposes of discriminatory treatment. Because is there any requirement in the policy that all violations of that policy, no matter what the conduct is that leads to the finding of the violation, must be treated the same? Your Honor, there is no one to piggybacking policy. No, no, no. That's what I mean. I get it. I get it. There's a... But just so I understand, you're saying there is a policy. It's got a name. There are policies, sir. If you look at the... Just let me finish the question. Okay. So there's this policy. There's different ways of violating that policy, right? Human beings could behave in different ways that would lead to violations of it. Which policy are you referring to, Your Honor? Whichever one you're referring to. Okay. One that applies to all of them. Yes. 10 to 20 of them. Great. There's different ways of violating it. Each one has a different number of charges. You've got to look at it, Your Honor. Okay. One of my points, Your Honor, is defendants are creating... Counsel, you've reserved some time. Yes, sir. May I please take the floor? Rosado on behalf of APEI, MBM, Inc. I want to start just by clarifying a few points made by opposing counsel. Even though MBM has no written rule on piggybacking with that name, Monia admitted during her deposition that she knew what the process was and that there was a card and a security code which was added for security purposes so that if someone found a card lying on the ground, that person could not access secure doors throughout the airport. Her own witness also testified that there is a training which she admitted she took, which is the security identification display area training, which expressly discusses piggyback. MBM assigns employees to different facilities, and in this case, Monia had a duty to abide by the security regulations of the airport. Now, I wanted to concentrate on three main points. First, I want to note that Monia did not appeal from the determination that she did not exhaust her hostile work environment claim under Title VII because she didn't include it in the charge that she filed before the EEOC. Monia has made no argument at all in the briefs before this court, so that argument has been waived, and there is no need to get into whether the allegations that she contains from Ortiz are sufficient to rise to a level of action under the Title VII hostile work environment or whether MBM, given that they were co-workers, is liable for that, although we submit for the reasons stated in our briefs that the answer to both questions is no. The district court has made a determination that MBM's discharge is burden of proof of extraction that it terminated Monia with just cause under loyalty. Monia is the master of her complaint, and she included a loyalty allegation in her complaint, which the district court decided. It bases the determination on the violations that Monia committed. She has tried to downplay the significance or even say they're fabricated, but there's a video before this court that shows her engaging in these three violations. She abandoned her post for a period of approximately two hours to go fraternize with a co-worker who was off-duty. This is a two-hour paid coffee break that she took. She also used her personal cell phone during work hours, and more importantly, she engaged in the serious security violation of piggybacking, which is a serious security violation both based on the unconfessed testimony from her own witness, Luis Morales, who was an airport security manager, and from the perspective of ICE, which is MVM's clients. What is it about piggybacking that she violated? What part of that process? On one occasion, which you saw in the video, she follows her co-worker. So let me backtrack. In order to access the doors at the airport, the restricted doors beyond DSA that only authorized people are allowed to go through, you have a card that you swipe, and you have a personal code specific to you that you have to punch in for the door to open. You have to wait for the green light to turn on, open the door, and go by only one person at a time in order to avoid the passage of unauthorized people. In this case, Alexandra Rodriguez, the co-worker who was off-duty and using her badge for personal reasons, went through, passed her badge, her code, opened the door, and Bonilla was on her phone, passed her badge, but kept going through without waiting for the door to close and without punching in her number, resulting in the access not registering. So her access was not registered even though she used the badge? Yes, because you need both the badge and the code in order for the access to register. And the same thing happened on the way back. It is not showing the video, in that case, which one goes first, but from the access records that are on record here, in that case it was Bonilla who did the process and Rodriguez who piggybacked. What's the reason for the requirement that the door close in between folks going through? Is it because you can get through without the code registering it? That's the only way to prevent that from happening? Exactly. It's two-fold. One, so that your access is registered, and that's for security purposes so we know who went by, what door at what time, and also in order to avoid someone who doesn't have a code. Because someone could find a badge lying around the airport and take it and try to pass without a code. So you need to do both and wait for the door to close. Is there anything in the summary judgment record about how frequently this violation is engaged, and specifically not letting the door close? There has been no other known violation like that to MBM from the record or from an MBM employee based on what Luis Morales testified. Did the other side depose anyone about that specific question? Both Luis Morales, who was a security manager, who was announced as a witness by Bonilla, and Christopher McHale from MBM were deposed and were asked. McHale testified that he did not know anyone else who had engaged in the violation, and Luis Morales testified that other people had engaged in the violation, but he also testified that no one from MBM. No one from MBM that he knew. Now, the district court also bases the termination of just cause on the fact that ICE made a renewal order to MBM for Bonilla and to other employees, and ICE was willing in its rights to do that based on the contract that it has with MBM, and MBM was called upon to act immediately upon that instruction. Also, under the collective bargaining agreement that covers Bonilla, that renewal order is deemed just cause for termination. It is significant that Bonilla did not appeal from that part of the judgment because if it were to justify termination, it could not have been discriminatory. Moving on to the retaliation, in her briefs, Bonilla focuses on the fact that she filed a new U.C. charge on August 12th and that she was terminated only two days later. And while this court has held that temporal proximity may be sufficient in some cases to establish causation, it is insufficient when there are other circumstances that undercut that inference, as it is in this case. It is also insufficient when the decision-makers did not know of the protected conduct at the time of her termination. And there is uncontested evidence on the record in the form of testimony from Elvira Nunez, the ICE representative who recommended the renewal of Bonilla and to other employees, including a male employee, that at the time that he made that recommendation, he did not know of the U.C. charge and he could not have known because he made it before the U.C. charge was filed. There is also uncontested testimony from Camilo Cuellar, the ICE representative who made the removal order, that at the time that he sent the email to NPM, with the order he did not know that Bonilla had filed an U.C. charge or that she had engaged in any other protected conduct for that matter. There is also uncontested evidence from Christopher McHale, the decision-maker from ICE, that at the time that he received the email from ICE and that he made the determination, the decision to terminate Bonilla and to other employees, that he had not seen the fax, the U.C. charge. We have been sent by fax... Excuse me, counsel, you said Mr. McHale was from ICE. He's from NPM. From NPM, sorry, excuse me. Correct, very good. When he received the email and made that determination, he had not seen the charge, which was sent to NPM by fax, but it wasn't addressed to McHale and it was sent to a general company fax that McHale rarely, if ever, uses. Under these circumstances, she cannot carry the burden of establishing what for causation, that she would not have been terminated, but for the filing of the U.C. charge, particularly because two other employees who had not filed U.C. charges were terminated. Regarding the discrimination, gender discrimination, she has focused on three employees, but she cannot carry the burden of establishing that they are similarly situated to her in all material respects, as the violations were not the same violation or even the same type of violation. Yes, in the disciplinary actions given by NPM to the employees, some standards of conduct, general standards of conduct were referenced and there was an overlap in those standards of conduct, but the actual violations were not the same. And for the decision makers in this case, the security nature of the violation is what disqualified these three employees from working under the contract. There is no evidence to establish that Eupedia Nunez or Camilo Cuella were acting based on gender discrimination, particularly because another employee, David Santiago, was also recommended for immediate removal or ordered for immediate removal based on a security violation related to the weapon that he was carrying and went into the airport with it, which violates airport security as well. So, if this court does not have any more questions, we request that it affirm the district court's grant of ambience motion for summary judgment. Perfect timing. Thank you. I listened to the appellate counsel state that somehow this was a security violation and the argument has always been that this was fabricated in Martha's case. Now, why do we say that? Because Martha testifies that when you see that training at the airport in the case, they do not show you how to use the process. They explain it in writing. They give you like a document to hand out, but they don't show how to do this process. She had to learn this on her own on the job. Now, Luz Morales, who is a security manager for the airport, testified that this process is described in a confidential document, security document from the airport, that is not readily accessible to the employees. There is no way that Martha could have verified what is the process that I have to go through. In fact, Luz Morales testified there were over a thousand doors at this airport that employees could have gone through, and each door has a different process depending on which way you go in. He also testified that ordinarily for these types of violations, if we're going to call it that, piggybacking, what they do is they offer employees retraining. They don't fire them. Now, if you look at defendant's police evidence, you're going to find that the continued access law states that she used her I.D. properly 28 times that same day. She finished her shift as actually confirmed by defendant's witness and she testified she completed her shift fully. So one time she misused her I.D. to go to school. Does that undercut your argument that she doesn't know how to do it because she wasn't properly trained? In this particular case, Your Honor, because in this particular case the person she walked through the door was to testify a few weeks later at a Title VII case. Now, one of the arguments is that she wanted to get away. As a matter of fact, there is an email from the defendant who testified to this. You've got 10 seconds. I'm just going to refer to it. There is an email, an internal email, where they specify that she had complained of harassment because of a thesis and she got away from him on that day because of that situation. She wanted to talk to someone who was in a Title VII case. That's the reason she walked away for a few hours from her post. Thank you.